No. 19,031.

THE COMMONWEALTH TRUST COMPANY, as Trustee, etc., *Appellant*, v. THE SCOTT CITY NORTHERN RAILROAD COMPANY et al., *Appellees*.

SYLLABUS BY THE COURT.

1. EXECUTION — *Levy upon Engine as Property of Execution Debtor — Claimed by Third Party — Conflicting Evidence — Findings Sustained.* On the trial of an issue to determine whether an engine which had been levied upon was the property of the execution debtor, a construction company, or of a railroad company claiming to own it, the fact appeared that the engine originally belonged to the construction company. The evidence was conflicting upon the question whether it had been transferred to the railroad company. A finding that no transfer had been made is therefore sustained.

2. SAME—*Competent Evidence to Show Ownership of Property.* Evidence that the president of the railroad company stated to the representative of the execution creditor before the levy was made that the engine did not belong to the railroad company, but did belong to the construction company, is held admissible in the situation stated in the opinion.

3. CONDEMNATION PROCEEDINGS — *Right of Way — Landowner's Lien for Award of Damages Superior to Mortgage Lien.* Land was appropriated by statutory proceedings for the right of way of a railroad and an award of damages was made. Without paying the award the company entered into, and remains in possession of, the right of way. The landowner brought an action upon the award, and recovered judgment for the amount awarded, or for the possession of the land on default of payment. Before the condemnation proceedings were instituted the railroad company had mortgaged its property, including the right of way, to secure bondholders. In an

action for foreclosure the landowner pleaded the condemnation proceedings and the unsatisfied judgment, and claimed a prior lien.  It is held that the lien of the mortgage is subject to the charge or lien for the amount of the award and judgment.

4. SAME.  The fact that the landowner held the land upon which the right of way was appropriated under a contract of purchase, the legal title being still in the vendor, does not affect his rights as determined in this action.  The award having been regularly made in favor of the vendee in possession he is entitled to the damage.  (*St. L., L. & D. Rld. Co. v. Wilder,* 17 Kan. 239, syl. ¶ 6.)

Appeal from Logan district court; JACOB C. RUPPENTHAL, judge.   Opinion filed November 14, 1914.   Affirmed.

*Lee Monroe, C. M. Monroe,* both of Topeka, and *W. S. Roark,* of Junction City, for the appellant.

*William Easton Hutchison, C. E. Vance,* both of Garden City, and *C. A. Spencer,* of Oakley, for the appellees.

The opinion of the court was delivered by

BENSON, J.: In an action to foreclose a mortgage made by the defendant railroad company to the plaintiff trust company, as trustee for bondholders, the trust company alleged that the defendant bank had unlawfully seized and sold upon execution a locomotive engine, a part of the mortgaged property.

At the trial the levy and sale were admitted and the only issue tried was the ownership of the engine.   The bank contended that the engine belonged to the Kansas Construction and Irrigation Company, against which company the execution was issued, while the plaintiff contended that it belonged to the railroad company by transfer from the construction company, which, it is conceded had previously owned it.   The real question for determination was whether such a transfer had been made.

It is not claimed that the railroad company owned the engine when the mortgage was made, but that it was after-acquired property covered by the mortgage.

The following facts material to the issue now under consideration were found by the court:

"5. . . . The Scott City Northern Railroad Company, of date August 5, 1910, entered into a contract with The Kansas Construction & Irrigation Company, by the terms of which said Construction Company agreed to construct a line of railroad from Scott City, Kansas, to Winona or Page City, Kansas, a distance of about fifty-five miles, and to equip the same with a stated number of cars and an oil-burning engine. . . .

"39. Locomotive Engine No. 4, now at Sharon Springs, claimed by the plaintiff herein, and also by the defendant, The First National Bank of Garden City, was, before the construction of the Scott City Northern Railroad, and ever since has been, the property of the Kansas Construction & Irrigation Company, and engine No. 1 was by said Construction Company, early in the period of construction, transferred and delivered to The Scott City Northern Railroad Company, as a part of the equipment under its contract, and in lieu of the oil-burning engine which was to have been delivered by the Construction Company but was destroyed by fire before such delivery could be made."

The district court concluded that the trust company had no lien upon the engine, and rendered judgment accordingly in favor of the bank.

It is contended that the 39th finding above recited is not a finding of fact, but a conclusion of law, not properly deducible from undisputed facts, which should have been found. These facts are thus stated by the plaintiff:

"1. Since 1909 B. M. McCue has been the President and E. A. Tennis the Secretary of The Kansas Construction and Irrigation Company and have owned substantially all of its capital stock.

"2. From the time of the organization of The Scott City Northern Railroad Company until it went into operation on the 1st day of August, 1911, Ralph Hoskinson was President and F. A. Gillespie, Vice President.

Soon after said date B. M. McCue became President and E. A. Tennis Vice President and General Manager of said Railroad Company.

"3.  In August, 1910, the Construction Company contracted to construct the Scott City Northern Railroad and to equip it with an 'oil-burning engine.'

"4.  The oil burning engine contemplated by said contract was numbered 3 and belonged to the Construction Company which then also owned two coal burning engines numbered 1 and 4 respectively.

"5.  Oil burning engine No. 3 was never delivered to the Railroad Company.  It passed through a round house fire in April, 1911, whereby it was supposed to be damaged beyond hope of repair.  A year later it being found to be worth repairing, was sent to Kansas City by The Construction Company for that purpose, with the intention to use it as a part of the equipment of The Three Forks Helena & Madison Valley Railroad which Tennis and McCue were promoting in Montana and was there stencilled with the inscription 'T. F. H. & M. V.'

"6.  Engine No. 1 had been used on The Garden City Gulf and Northern Railroad, bore the inscription 'G. C. G. & N.' on its cab and tender, which inscription was never changed except as stated in paragraph 7 and was used by the Construction Company in construction work upon the Scott City Northern Railroad.  After the railroad was completed it was left on the Railroad Company's tracks at Scott City.  After engine No. 4 became disabled in October, 1911, it was used to haul regular trains on the railroad until August, 1912.

"7.  In June, 1912, the tank or tender of Engine No. 1 was shipped by Tennis to Three Forks, Montana, with the purpose to use it as the tender to oil burning engine No. 3 whose tender had been destroyed by the round house fire at Garden City.  Upon its arrival at Three Forks, the following inscription was painted on each side of said tender:  'T. F. H. & M. V.'

"8.  After the round house fire and when the Railroad was nearing completion Engine No. 4, involved in this case, was sent to Pueblo, Colo., by the Construction Company for repairs.  It was there thoroughly overhauled and repaired and on each side of its cab and tender the inscription 'S. C. N. R. R.' was painted. When these repairs were completed this engine and its

tender were brought to Scott City and placed on the side tracks of the Scott City Northern Railroad. When the Railroad went into operation it was used and was the only engine used to haul the regular trains until it broke down the latter part of October, 1911. It was then placed on one of the Railroad Company's side tracks at Scott City where it remained until June, 1912.

"9. In June, 1912, H. E. Hedlund, Superintendent of the Scott City Northern Railroad, pursuant to orders from his superior officer, E. A. Tennis, Vice President and General Manager, shipped Engine No. 4 to Sharon Springs for repairs. The engine was shipped 'dead head' over the Scott City Northern Railroad to Winona as the property of the Scott City Northern Railroad Company and there delivered to the Union Pacific Railroad.

"10. The tender to Engine No. 4 was not sent with the engine to Sharon Springs but was kept at Scott City and used as a tender to Engine No. 1.

"11. In the month of April, 1912, Tennis, as Vice President of the Railroad Company, made a written return of its property for taxation to the State Tax Commission in which Engines No. 1 and 4 were both listed for taxation as the property of the Scott City Northern Railroad Company.

"12. In February, 1912, McCue as President and Tennis as Secretary of the Construction Company made its annual corporation report to the Secretary of State showing that it owned no property except cash, stocks, bonds and bills and accounts receivable."

It can not be successfully contended that the above-recited facts conclusively prove that the title to engine No. 4 was in the railroad company at the date of the levy, although they were consistent with such title and tended to prove it, but if there was substantial evidence to prove the contrary, the conclusion of fact can not be overthrown in this court, as held in a multitude of decisions. The engine was a part of the equipment originally belonging to the construction company regularly used in its work. If it ever became the property of the railroad company it must have been through some sale or transfer. In his testimony B. M. McCue,

president of the railroad company, testified that no oil-burning engine was ever delivered to the railroad company, as provided in the contract, but that engine No. 1, a coal burner, was substituted for it. The oil-burning engine had been burned and an engine was needed to operate the road.

Mr. McCue testified:

"I have been President of The Kansas Construction & Irrigation Company ever since it was organized in 1909. Mr. E. A. Tennis was the active member of the working part of the company. The Kansas Construction and Irrigation Company and The Scott City Northern Railroad Company executed the contract. At the time this contract was signed Mr. E. A. Tennis and myself owned the stock and was promoting and organizing The Scott City Northern Railroad Company. These officers were men who were just simply chosen by us to act as such. No oil burning engine was ever delivered to The Scott City Northern Railroad Company in compliance with that contract. Engine No. 1 was substituted for the oil burning locomotive.

"Q. In what manner was that substituted? A. The oil burning engine was burned in the round house at Garden City, just before we had the road completed on the north end, the Scott City Northern Railroad, and of course, we knew that we had to have an engine to take care of the traffic when the road was put in operation, so after a conference with Mr. Tennis, we decided that engine number one was the most practical engine, and the best of the two that we had left of the Construction Company's engines.

"Q. What engines did the Kansas Construction & Irrigation Company own at the time that the Scott City Northern Railroad was completed? A. They owned three engines; that is, the oil burning engine, which was burned in the fire, and the two coal burning engines, which are number one and number four.

"Q. Number four is the same engine that has been levied upon by the First National Bank? A. Yes, sir?"

The foregoing testimony relating to the substitution was objected to "for the reason that it appears that any such agreement was made with themselves." Engine No. 1 then belonged to the construction company,

and evidence of an intention by the managing officers of that company to substitute it for the one that had been burned and that the substitution was made, was competent in connection with the proof that it was thereafter used by the railroad company in operating its road, and still remains in its possession. This is some evidence at least to sustain the finding.

The testimony of Mr. McCue to the effect that the construction company never sold or transferred engine No. 4, or took any step to that end, is of a negative character, often given to prove the absence of a fact. A transfer could only be made by the act of some authorized agent or officer, and the testimony in effect was that there was no such act. It was held in *Murphy v. Hindman,* 58 Kan. 184, 186, 48 Pac. 850, construing the section of the code making witnesses incompetent in certain cases to testify to transactions with persons since deceased, that testimony denying that a transaction had taken place and that no transfer of title had ever been made was admissible. (See, also, 17 Cyc. 224.) Mr. McCue and Mr. Tennis were the officers in active management and control of the business for the construction company, and it appears that they managed the business of the railroad, and upon its completion became its managing officers also. Certainly the testimony of such officers that a sale had not been made by one company to the other was admissible, subject to rebuttal by circumstances or other evidence tending to prove otherwise.

Before levying on the engine, the cashier of the bank inquired of both Mr. McCue and Mr. Tennis whether it belonged to the railroad company, and was told that it did not, but that it had always belonged to the construction company. They were then the president, and vice president and general manager, respectively, of the railroad company, in control of its affairs. Objection is made to the testimony that it was only a conclusion of these officers that the railroad company did

not own the engine, but it is a conclusion of fact, and certainly the statement of the president of a railroad company, in the active management of its business, may be received in evidence in such circumstances. True, it is not conclusive evidence, but it is competent. On the other hand, the fact that the engine was marked to indicate ownership by the railroad company was some evidence tending to prove that fact. That it was used for a time in the operation of the railroad was also admissible for the same purpose. When we remember, however, the intimate relation of the two companies, one constructing and the other operating the road, and that both were controlled by the same persons, who were managing officers of both companies, it readily appears that the use at times by one of part of the equipment of the other does not necessarily determine the ownership of such equipment in favor of either, although use and possession are proper matters to be considered in determining that fact.

It is concluded that finding No. 39 is sustained by competent evidence.

Another issue was joined upon the intervening petition of W. F. Shelton, who claimed a lien upon the right of way, a part of the mortgaged property. Upon this issue a finding was made, viz.:

"42. The defendant, W. H. Shelton, in this court, on April 28, 1912, in an action, No. 929, against The Scott City Northern Railroad Company, recovered judgment for $625.00 with six per cent interest per annum, and in the judgment and decree a stay of execution was granted for one year from the further order and decree in said case of ejectment of the defendant Railroad Company from the premises in controversy in said action, which premises were crossed by said railroad, and right of way taken, and a further decree that after one year from the date of the rendition of judgment, if not paid, the defendant Railroad Company would be enjoined and restrained permanently from the use of said right of way across the premises in controversy."

The petition upon which the judgment referred to in this finding was based alleged that the plaintiff in that action owned the land over which the right of way extended, under contracts with the Union Pacific Land Company, which right of way was appropriated under condemnation proceedings instituted by the railroad company; that an award of damages to the amount of $600 was thereupon made in his favor, and that the railroad company had taken and held the right of way without paying the award. Judgment was asked for the amount of the award, and in default of payment that the possession be restored. Issues were joined upon the petition. These issues were tried, and a judgment was rendered for the amount of the award with interest and for ejectment in default of payment.

It was admitted in the trial of this action that the legal title to the Shelton lands stands in the name of the Union Pacific Land Company. No evidence was offered except the record of the prior action and this admission.

The plaintiff contends that the burden was on the intervenor to prove his damages otherwise than by the judgment, by which it is not bound. It relies upon the general principle that one not a party to an action is not bound by the judgment. Without questioning the soundness of that general rule it should be remembered that in some cases and for some purposes a judgment is admissible as *prima facie* evidence against a stranger to the record. The general rule in its application to a different situation is referred to in *Richolson v. Ferguson,* 87 Kan. 411, 413, 124 Pac. 360, where it was observed that Mr. Freeman says that the question of the *prima facie* effect of a judgment against a warrantor without notice of the action in which it was rendered has not been carefully considered. Without deciding whether the cases referred to holding that a judgment is admissible as *prima facie* evidence against a stranger to the record should be followed, the facts of this particular case warrant the admission of the evidence.

The mortgage was made and delivered before the railroad company had acquired any right of way. The construction of the road was contemplated. A right of way was essential to the undertaking. This right of way, when it was acquired, although a part of the mortgaged property, was then subject to the payment of the award. The right and the charge upon it were created at the same time. Neither had any existence apart from the other. The fact that a judgment was rendered upon the award did not change its nature. (*Central Trust Co. v. Thurman,* 94 Ga. 735, 20 S. E. 141.) It was not an ordinary judgment for money to be collected on execution, but one giving a remedy by ejectment on failure to pay, and the judgment so directed in accordance with the practice in such cases. (*St. L., L. & D. Rld. Co. v. Wilder,* 17 Kan. 239; *L. & T. Rly. Co. v. Moore,* 24 Kan. 323, 328.) The plaintiffs' mortgage lien could attach only to the interest of the railroad company in the right of way which was always subject to the charge or lien of the award which determined the amount of the damages. (*Railway Co. v. Murphy,* 75 Kan. 707, 90 Pac. 290; *Gilman v. The Sheboygan & Fond Du Lac Railroad Company,* 40 Wis. 653.)

"No rights can be acquired in private property under the power of eminent domain except subject to the duty of making just compensation therefor. Consequently, the party originally taking or occupying the property can not transfer to another, by mortgage, lease, or otherwise, any right in the property except subject to the same duty. In other words, the owner's claim for just compensation is paramount to any right which can be derived by or through the party making or seeking the condemnation. Different courts work out this result in different ways, but we believe all concur in reaching it in one way or another. . . . The foreclosure of a mortgage upon the property and franchises of the condemnor, to which the claimants for damages are not parties, can not affect the rights of the latter. Sometimes such claimants are made parties and their rights adjusted in the foreclosure proceeding, and the

property sold clear of such claims. In such case the claims for land damages should be given preference to the mortgage debt in the distribution of the proceeds, and a decree to the contrary is error." (2 Lewis, Eminent Domain, 2d ed, § 621, 3d ed., § 886.)

"Except where the vendor has waived his right to priority, or the vendor's lien is a secret one of which the mortgage bondholders had no notice, the lien of a vendor of land sold or taken for railroad purposes for the unpaid purchase-price thereof or for just compensation, if no price has been fixed, is superior to that of a mortgage on the road." (33 Cyc. 527.)

A judgment is evidence of its own existence, against strangers as well as parties and privies. The record is admissible to prove the fact that such a judgment was rendered. It is also said to be *prima facie* evidence in cases analogous to this, even against strangers, of the relation of debtor and creditor, not only of the fact, but the amount of indebtedness. (2 Black on Judgments, § 605.) If a note and mortgage had been given to secure the purchase money on private negotiations the note would have been evidence of the amount against the railroad company, and the record of this award and judgment is evidence of equal probative force.

" 'It is not inconsistent with the rule of *res inter alios acta* that a judgment should be taken even against third persons to be what it purports to be till the contrary is shown.' Whenever a judgment creditor is proceeding against a third person, and it becomes necessary to show that the judgment debtor was indebted to him, the judgment is at least *prima facie* evidence of that fact. In truth, it is generally much more than *prima facie* evidence." (2 Freeman on Judgments, 4th ed., § 418.)

Without pursuing the discussion further it is held upon principles of equity, and in accordance with the recognized authorities, that the lien of the plaintiff's mortgage is subject to the award and judgment in favor of the intervenor, as the court determined.

The fact that the intervenor holds the land under a contract, the legal title being still in the vendor, does not affect his rights in this action. The award having been made in favor of the vendee in possession, he is entitled to the damages. (*St. L., L. & D. Rld. Co. v. Wilder*, 17 Kan. 239.)

The judgment is affirmed.